* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and oral arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. The Full Commission hereby adopts the Opinion and Award of the Deputy Commissioner with minor modifications.
 * * * * * * * * * * * RULING ON EVIDENTIARY MATTERS
Plaintiff and Defendants both filed Motions to Re-open the Record to admit additional evidence into the record on June 16, 2008 and June 19, 2008 respectively. Plaintiff filed a Second Motion to Receive Additional Evidence on November 11, 2008. *Page 2 
After reviewing the Motions and the record in this matter, plaintiff's and defendants' Motions are HEREBY DENIED.
 * * * * * * * * * *
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner, and in the executed Pre-Trial Agreement, as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated, and there is no question as to misjoinder or nonjoinder of parties.
4. Plaintiff sustained a compensable injury on November 1, 2002 when she fell on a curb and twisted her left ankle and hit her head and right hand.
5. An employment relationship existed between plaintiff and defendant-employer on November 1, 2002.
6. Plaintiff's average weekly wage is $579.46, yielding a compensation rate of $386.31.
7. Defendants filed a Form 61 Denial of Claim on December 18, 2002, citing that the claim was denied because it was due to an unrelated medical condition causing plaintiff to get dizzy and fall, that the employment did not cause plaintiff to become dizzy and fall, and that *Page 3 
the injury was the result of an unrelated medical condition (elevated blood sugar in excess of 500 mg).
8. Plaintiff filed a Form 33 Request for Hearing on February 14, 2003, citing that defendants had denied the claim.
9. Defendants filed a Form 33R on April 2, 2003, citing that the injuries sustained did not arise out of and in the course of employment, that plaintiff had reached maximum medical improvement, that plaintiff was no longer disabled, and that plaintiff had constructively refused suitable employment.
10. Mediation was held on July 23, 2003 and resulted in an impasse, as reflected in the August 5, 2003 Report of Mediator.
11. A hearing was held before Chief Deputy Commissioner Stephen T. Gheen on October 10, 2003 in Monroe, North Carolina.
12. The parties obtained the deposition of Dr. Rembert Crawford and Dr. Fred McQueen on November 25, 2003.
13. On February 18, 2004, Chief Deputy Commissioner Gheen filed an Opinion and Award finding that plaintiff sustained a compensable injury and was entitled to compensation.
14. On February 18, 2004, plaintiff filed a Motion for Reconsideration of the period of compensation due.
15. On February 19, 2004, Chief Deputy Commissioner Gheen found that plaintiff stated good grounds to grant the motion and entered an amended Opinion and Award.
16. On February 24, 2004, defendants appealed the Opinion and Award entered on February 19, 2004 by filing a Notice of Appeal. *Page 4 
17. On June 7, 2004, the parties received the transcript of the hearing, and defendants timely filed their Form 44 and Brief to the Full Commission on July 2, 2004.
18. Plaintiff timely filed her Rebuttal Brief to the Full Commission on July 26, 2004.
19. The Full Commission entered an Opinion and Award on August 15, 2005 finding that plaintiff sustained an injury by accident to her left ankle on November 1, 2002, that plaintiff was entitled to compensation from November 1, 2002 through December 17, 2002, that plaintiff had failed to prove by the greater weight of the evidence that she was temporarily totally disabled from the date her employment ended with RCC (December 30, 2002) and continuing through the date of the October 10, 2003 hearing, and that the medical evidence established plaintiff was capable of sedentary work as of the date of the hearing.
20. Plaintiff filed a Motion for Reconsideration before the Full Commission on September 21, 2005, which was subsequently denied by Order entered on April 13, 2006.
21. Plaintiff filed a Form 33 Request for Hearing on January 25, 2007, citing that the parties were unable to agree regarding a determination of plaintiff's entitlement to temporary total disability compensation effective October 10, 2003 and regarding payment of medical treatment related to or the natural consequence of the November 1, 2002 injury and that plaintiff had suffered a worsening of condition.
22. Defendants filed a Form 33R on February 15, 2007 citing that plaintiff is not disabled within the meaning of the North Carolina Workers' Compensation Act and that plaintiff had failed to provide ongoing medical records pursuant to Rule 607 request. Defendants later agreed that plaintiff had provided the medical records.
23. On February 26, 2007, Deputy Commission John C. Schafer entered an Order excusing the case from mediation. *Page 5 
 * * * * * * * * * * * EXHIBITS
The following documents were accepted into evidence as stipulated exhibits:
 • Exhibit 1: Executed Pre-Trial Agreement
 • Exhibit 2: Industrial Commission Forms
 • Exhibit 3: Plaintiff's medical records (supplemented by additional records provided with Plaintiff's counsel's letter dated May 30, 2007)
 • Exhibit 4: Hearing transcript and exhibits from October 10, 2003 hearing
 • Exhibit 5: Transcript of deposition of Dr. Rembert Crawford, taken on November 25, 2003
 • Exhibit 6: Transcript of deposition of Dr. Fred McQueen Jr., taken on November 25, 2003
 • Exhibit 7: Opinion and Award by Chief Deputy Commissioner Stephen T. Gheen, filed February 19, 2004
 • Exhibit 8: Opinion and Award for the Full Commission by Chairman Buck Lattimore, filed August 15, 2005
Transcripts of depositions of the following were also received post-hearing:
 • Dr. Rembert Crawford, taken on July 17, 2007
 • Dr. Bruce Cohen
 • Dr. David Strom
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following: *Page 6 
 FINDINGS OF FACT
1. Plaintiff is 42 years old, with a birth date of March 11, 1966. She has a Bachelors Degree in Psychology. Prior to sustaining her compensable injury on November 1, 2002, plaintiff worked at Richmond Community College as a case manager and counselor of persons participating in the Welfare to Work program, which was administered under a government grant. Plaintiff has also been employed by Richmond Community College in various capacities as a teacher, counselor, test administrator and case manager for more than five years.
2. On November 1, 2002, plaintiff had left a meeting at the Rockingham, North Carolina campus of Richmond Community College and was walking to her vehicle when she mis-stepped on a curb, falling and twisting her left ankle. At the time of the fall, plaintiff weighed about 270 pounds. Plaintiff is diabetic.
3. Plaintiff was initially diagnosed as having sustained a grade-four lateral inversion sprain of her left ankle with a torn calcaneofibular ligament and compression of the deltoid ligament.
4. Because this claim was denied by defendants and plaintiff had no private health insurance, plaintiff's left ankle condition went substantially untreated until September 26, 2003, when Dr. Crawford, a board-certified podiatrist, began treating plaintiff.
5. On September 26, 2003, just two weeks before the first hearing in this claim on October 10, 2003, Dr. Crawford opined that the inflammation of the deep peroneal nerve in plaintiff's left ankle was severe. In November 2003, Dr. Crawford recommended tarsal tunnel surgery to address plaintiff's symptoms.
6. In his February 19, 2004 Opinion and Award, Chief Deputy Commissioner Gheen ruled that Dr. Crawford was to be plaintiff's authorized treating physician for her compensable *Page 7 
left ankle condition, and Chief Deputy Commissioner Gheen also ruled, specifically, that defendants were to authorize and pay for the surgery that Dr. Crawford had recommended. No stay of Chief Deputy Commissioner Gheen's Order was ever sought or granted.
7. In its August 15, 2005 Opinion and Award, the Full Commission affirmed that Dr. Crawford was to be plaintiff's authorized treating physician for her compensable left ankle condition, and also affirmed, specifically, that defendants were to authorize and pay for the surgery that Dr. Crawford had recommended. No stay of the Full Commission's Order was ever sought or granted.
8. Defendant-carrier never followed up with Dr. Crawford and never authorized the surgery with him or paid for any of his treatment. Defendant-carrier has not paid for any medical treatment for plaintiff's compensable left ankle condition, with Dr. Crawford or any other provider(s).
9. In its August 15, 2005 Opinion and Award, the Full Commission also concluded that, between December 18, 2002 and October 10, 2003 (the date of the first hearing), plaintiff was capable of sedentary work, for which the Full Commission found plaintiff was well-suited, given her education, training and experience.
10. Plaintiff received unemployment benefits for the period from January 18, 2003 through October 18, 2003 at the rate of $295.00 per week. During that time, plaintiff looked for work without success. When her unemployment benefits ended, plaintiff did not apply for an extension because she felt that she was unable to work, or even to look for work, because of the pain in and about her left ankle.
11. Since December 18, 2002, plaintiff has not returned to work, and the condition of her left ankle has continued to deteriorate since the date of the first hearing. *Page 8 
12. After her initial consultation with Dr. Crawford on September 26, 2003, plaintiff continued to treat with him, seeing him about every three weeks for the swelling and pain in her left ankle, through November 19, 2004. During that time, Dr. Crawford continued with conservative treatment for plaintiff's left ankle symptoms but her condition continued to worsen.
13. The results of an MRI of plaintiff's left ankle from December 2, 2003 showed that plaintiff had chronic sinus tarsi disease evidenced by fibrosis with mild acute edema.
14. As of December 2003, plaintiff could not stand for long without swelling developing in her left foot and ankle, she could not walk more than 50 feet without stopping, she could not walk at all without a noticeable limp, nor could she climb stairs.
15. With conservative treatment failing, Dr. Crawford recommended surgery for plaintiff's left ankle, and, on November 19, 2004, his last visit with plaintiff, he recommended a second MRI in preparation for the surgery. However, plaintiff had no insurance and defendants were not paying for plaintiff's medical treatment. Thus, plaintiff was unable to have the surgery at that time.
16. Plaintiff underwent the second MRI of her left ankle on November 22, 2004, and it showed fibrous inflammation in the sinus tarsi, which is on the lateral aspect of the left foot and is consistent with an inversion sprain. The results confirmed Dr. Crawford's initial diagnosis and supported his recommendation that she needed surgery as far back as November of 2003.
17. Not being able to afford the surgery, plaintiff never returned to Dr. Crawford.
18. Plaintiff became eligible for Medicare and began seeing Dr. Strom, a board-certified orthopedic surgeon, on January 13, 2005. Dr. Strom reported appreciable swelling of plaintiff's left ankle and hind foot, mostly toward the lateral side, and he indicated that *Page 9 
movement of the ankle increased her discomfort. Dr. Strom diagnosed synovitis of the left foot and ankle post-injury two-plus years prior.
19. Based on the failed conservative treatment and chronic nature of plaintiff's symptoms, Dr. Strom recommended a synovectomy for plaintiff, which he performed on February 3, 2005.
20. Plaintiff's left ankle and foot continued to be problematic after her surgery. Her foot was tender and she had swelling over the subtalar joint. When plaintiff's condition was the same in August 2005, Dr. Strom recommended a subtalar arthrodesis, which he performed on September 16, 2005. Afterward, plaintiff had to go to the emergency room because she had drainage from the surgical wound.
21. Three months after the second surgery, plaintiff was having trouble normalizing her gait and was still using a walker and brace. Six months post-surgery, plaintiff still had pain and swelling in her left foot and ankle, with some days worse than others and Dr. Strom recommended physical and aquatic therapy for plaintiff to try to reduce the pain and swelling.
22. Dr. Strom inserted a bone stimulator in June 2006 but plaintiff's pain increased after the insertion. By October 12, 2006, plaintiff was reporting some improvement in her symptoms with the bone stimulator and physical therapy. She still had swelling in her left foot, but her pain and her difficulty with walking were not as bad as before.
23. Plaintiff continued to have pain and tenderness in her left lateral hind foot, which Dr. Strom confirmed upon examination on February 1, 2007. As such, Dr. Strom recommended a revision arthrodesis, which he performed on February 8, 2007. Thereafter, plaintiff developed significant wound-healing problems post-surgery. *Page 10 
24. Plaintiff had to undergo another procedure with Dr. Strom to have the bone stimulator removed and she has continued to have drainage even after the removal.
25. Plaintiff also showed signs of neuritis or neuroma in the superficial peroneal nerve of her left ankle and this nerve was excised in another procedure in June 2007.
26. Plaintiff saw Dr. Cohen, a board-certified orthopedist, for an Independent Medical Evaluation on July 24, 2007. Dr. Cohen noted that plaintiff had pain with any hind foot movement, was slightly limited in her tibiotalar range of motion, and he further noted a small amount of bloody-looking drainage. Dr. Cohen could not tell whether plaintiff's ankle had fused following the revision subtalar arthrodesis and his impression was continued drainage post-revision subtalar arthrodesis.
27. Dr. Cohen was very concerned about continued swelling and infection and he recommended a repeat procedure to gather deep cultures and bone biopsy to determine whether plaintiff has a serious infection. Dr. Cohen also recommended if plaintiff does have a deep infection, that she have a CT scan to evaluate whether it is necessary to remove the screw in plaintiff's left ankle. Finally, he recommended that plaintiff be considered for an infectious disease consultation, and he indicated that she might need a more aggressive course of IV antibiotics by PICC line.
28. Following the IME, plaintiff continued to have drainage from the surgical site and cultures of the drainage grew a strep species. As a result, Dr. Strom performed an irrigation and debridement on August 3, 2007. Dr. Strom found no evidence of non-union in plaintiff's left ankle or pus in the wound, which indicated to Dr. Strom that the infection was likely, superficial. He put plaintiff on IV antibiotics daily via a PICC line and instructed her to be *Page 11 
weight-bearing on the left foot as tolerated. Dr. Strom further opined that infection is a normal risk of any surgical procedure.
29. On August 15, 2007, Dr. Strom wrote the following in a letter: "[plaintiff] is not currently employable due to her foot problems, as well as co-morbidities including diabetes, gait disturbance and pain. She also requires frequent medical visits, and has an ongoing, open wound. In my professional opinion, her injury caused the problem which required surgery with respect to her left foot. It is my opinion she has not reached MMI, and unfortunately, I cannot predict when that might occur. Her prognosis for full recovery is guarded."
30. Every time Dr. Strom has seen plaintiff, she has had tenderness over the subtalar joint of her left foot with swelling and this presentation is consistent with the aftermath of a severe inversion sprain. Dr. Strom believes the disruption of plaintiff's subtalar joint and the ongoing synovitis and arthritis in the joint were direct consequences of plaintiff's November 1, 2002 injury.
31. Dr. Crawford testified that due to plaintiff's left foot condition, plaintiff was not capable of gainful employment from October 10, 2003 through his last appointment with her on November 19, 2004. Dr. Crawford further explained that plaintiff was not even capable of doing sedentary work during this period, as defined by the U.S. Department of Labor, because she still would have had to walk to get to and from the job, she would have had to walk to some degree even within the context of a desk job in an office, and her high Neurontin dosages for her pain made her lethargic and disoriented.
32. All the treatment that Dr. Crawford provided to plaintiff was related to her November 1, 2002 ankle inversion injury, and he deferred to Dr. Strom, whom he characterized as a highly-qualified foot and ankle orthopedist, for plaintiff's treatment after late 2004. *Page 12 
33. As of Dr. Strom's deposition on September 11, 2007, plaintiff had ongoing drainage from her left foot and ankle. Dr. Strom opined that plaintiff was not employable as of the date of his deposition and had not been employable since he began treating her on January 13, 2005. Dr. Strom attributed plaintiff's inability to do even sedentary work to her constant need for doctor's visits and, more so, to her intractable pain which dominates her life and left foot and ankle.
34. Dr. Strom could not say at his deposition whether the subtalar joint fusion had fully taken or would fully take, and he believed that if, in the future, the fusion is confirmed to have taken and the wound heals fully, plaintiff will be close to maximum medical improvement. Dr. Strom stated that it would be futile for plaintiff to look for work until she has reached MMI.
35. Dr. Cohen stated that his impression of plaintiff's condition was incomplete because he wanted further work-up. Dr. Cohen did relate his findings and recommendations to the November 1, 2002 injury and he stated that plaintiff is not at MMI. Dr. Cohen believes plaintiff can do sedentary-level work, but that she can do nothing more demanding than that because of her drainage and pain. Dr. Cohen testified that plaintiff has been capable of sedentary work at all times since her injury except for those periods immediately around her surgeries. Dr. Cohen defined sedentary work as primarily involving sitting with limited standing and walking. Dr. Cohen confirmed that plaintiff had pain upon examination and he did not know what walking 50 feet would do to the swelling and pain in plaintiff's left foot and ankle. He stated that a functional capacity evaluation, upon plaintiff's reaching MMI, would be necessary in order to assess plaintiff's physical capabilities. Dr. Cohen agreed with Dr. Strom's treatment of plaintiff. Dr. Cohen also noted that diabetes can affect wound healing and slow down a patient's recovery from surgery significantly. *Page 13 
36. On the issue of plaintiff's disability, the Full Commission assigns greater weight to the testimony of Drs. Crawford and Strom, plaintiff's long-standing treating physicians, than to that of Dr. Cohen, who saw plaintiff once for an IME.
37. Plaintiff has been unable to work in any capacity since October 10, 2003 due to her compensable November 1, 2002 injury by accident.
38. Plaintiff's infections resulting from her surgeries are causally related to the compensable November 1, 2002 injury by accident.
39. The treatment that plaintiff has received for her compensable left foot and ankle condition with and at the direction of Drs. Crawford and Strom has been reasonably required to effect a cure, provide relief and/or lessen the period of plaintiff's disability. Further medical treatment for plaintiff with Dr. Strom is reasonably required to effect a cure, provide relief and/or lessen the period of plaintiff's disability.
40. Defendants have not engaged in unreasonable or unfounded litigiousness with regarding to the issue of ongoing indemnity compensation.
41. Defendants have provided no reasonable excuse or explanation for their failure to authorize and pay for Dr. Crawford's treatment, including specifically the surgery that he recommended, and further reasonably necessary treatment as ordered by the August 15, 2005 Full Commission Opinion and Award.
42. Plaintiff requested attorney's fees under N.C. Gen. Stat. § 97-88
should the undersigned order the insurer to make or continue to make payments of benefits to plaintiff. A reasonable attorney's fee for defending this matter on appeal to the Full Commission is $2,000.00.
 * * * * * * * * * * * *Page 14 
Based on the foregoing Findings of Fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff has suffered a worsening of her compensable left foot and ankle condition since October 10, 2003. N.C. Gen. Stat. § 97-47.
2. Plaintiff's ongoing infection is a direct and natural consequence of her compensable left foot and ankle condition in that it resulted naturally from the treatment rendered for said condition and the infection is thus itself compensable. Horne v. Universal Leaf TobaccoProcessors, 119 N.C. App. 682, 459 S.E.2d 797, disc. rev. denied, 342 N.C. 192, 403 S.E.2d 237 (1995).
3. Plaintiff has produced medical evidence that, as a consequence of her compensable left foot and ankle condition and/or resultant infection, she has been physically incapable of work in any employment from October 10, 2003 through the present and ongoing and she is entitled to receive temporary total disability compensation for that period. N.C. Gen. Stat. §§ 97-2(6) and 97-29; Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
4. Defendants are entitled to a dollar-for-dollar credit against any temporary total disability payments awarded herein for the unemployment benefits that plaintiff received October 10 through 18, 2003, at the rate of $295.00 per week. N.C. Gen. Stat. § 97-42.1.
5. Plaintiff is entitled to have defendants pay for the medical treatment she received with and at the direction of Drs. Crawford and Strom for her compensable left foot and ankle condition and infection. She is also entitled to have defendants authorize and pay for further treatment for her compensable left foot and ankle condition and infection with Dr. Strom. N.C. Gen. Stat. §§ 97-2(19) and 97-25. *Page 15 
6. Defendants are subject to sanctions in the form of attorney's fees for their failure to comply with the previous Full Commission Opinion and Award regarding the payment of plaintiff's medical treatment. N.C. Gen. Stat. § 97-88.1.
7. A reasonable attorney's fee for defending this matter on appeal is $2,000.00. N.C. Gen. Stat. § 97-88.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fees awarded below, defendants shall pay to plaintiff, in a lump sum, temporary total disability compensation in the amount of $386.31 per week beginning October 10, 2003 and continuing until further Order of the Commission, less a credit of $295.00 per week for the period October 10 through 18, 2003.
2. As plaintiff's attorney's fee, defendants shall pay to plaintiff's counsel an amount equal to 25% of the lump sum temporary total disability compensation due under Paragraph 1 above, such amount to be paid in addition to the entire lump sum and not taken out of the amount owed plaintiff. Defendants shall further make every fourth ongoing temporary total disability check payable to plaintiff's counsel.
3. In addition to the above attorney's fees, defendants shall pay to plaintiff's counsel an attorney's fee of $2,000.00 pursuant to N.C. Gen. Stat. § 97-88.
4. Defendants shall pay for all medical treatment that plaintiff has heretofore received with and/or at the direction of Drs. Crawford and/or Strom, including but not limited to diagnostic testing, prescriptions, surgeries, assistive devices, physical and aquatic therapy and *Page 16 
mileage. To the extent that plaintiff, Medicare and/or any other third-party payor have paid for any such treatment, defendants shall reimburse such payor in full. If she has not already done so, plaintiff shall contact Medicare immediately to determine the amounts it has paid and submit her findings to defendants.
5. To the extent that Medicare has paid for plaintiff's treatment, and to the extent that the Industrial Commission's fee schedule amounts exceed the amounts paid by Medicare for treatment, defendants shall promptly pay the difference to the providers when said bills are properly submitted.
6. Dr. Strom is hereby designated as plaintiff's treating physician and defendants shall authorize and pay for the treatment that Dr. Strom recommends for plaintiff's compensable left foot and ankle condition and/or infection, including but not limited to diagnostic testing, prescriptions, surgeries, assistive devices, physical and aquatic therapy, referrals and mileage.
7. Defendants shall pay the costs. As part of their costs, if they have not done so already, Defendants shall pay an expert witness fee to each of the following providers, in the amount shown or the amount actually billed, whichever is less: $300.00 to Dr. Crawford; $510.00 to Dr. Cohen; and $510.00 to Dr. Strom.
This the 30th day of November 2008.
 S/_______________________ BUCK LATTIMORE COMMISSIONER
 CONCURRING: *Page 17 
 S/_______________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________________ DIANNE C. SELLERS COMMISSIONER *Page 1